*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SCHWINTEK, INC.,

      Plaintiff-Appellant,

v

HIGH TOP BUDS, LLC,

      Defendant-Appellee,

and

VILLAGE OF CASSOPOLIS,

      Defendant.

UNPUBLISHED
July 14, 2022

No. 357152
Cass Circuit Court
LC No. 21-000056-CZ

Before: SAWYER, P.J., and LETICA and PATEL, JJ.

PER CURIAM.

High Top Buds, LLC (HTB) owns 39.06 acres of a 48.8-acre industrial park in Cassopolis, Michigan. The village council approved HTB's plans to erect several buildings on the land to cultivate and process marijuana. The industrial park was subject to restrictive covenants that HTB revoked before the 10-year automatic renewal date. Schwintek, Inc., which owns a 3.28-acre parcel in the industrial park, brought an action asserting that HTB's marijuana operations violate the restrictive covenants and that its revocation was invalid because it was premature, non-uniform, and undermined the purpose of the restrictive covenants.

HTB successfully revoked the restrictive covenants. As the owner of more than 75 percent of the real estate in the industrial park, HTB was authorized to revoke the restrictive covenants. The revocation become effective on the date of the 10-year automatic renewal. Further, the revocation was uniform because it revoked the restrictive covenants for the *entire* industrial park. We affirm the trial court's grant of summary disposition in favor of HTB pursuant to MCR 2.116(C)(10).

## I. BACKGROUND

Cassopolis Industrial Park consists of approximately 50 acres in the I-2 manufacturing zoning district in the village of Cassopolis, Michigan. The industrial park, which was created by the village in 1990, was subject to a set of restrictive covenants that ran with the land. The restrictions provided for a 10-year automatic renewal period as well as authorization for a majority of real estate owners to revoke or modify the restrictions:

> 3. These restrictions shall be effective and binding on grantor, grantee, their respective assigns, successors in interest and all parties claiming by, under or through them until December 31, 2000, at which time these restrictions be automatically extended for successive periods thereafter of ten years each, unless owners of more than 75 per cent of the real estate located in said Village of Cassopolis Industrial Park shall execute and record in Cass County Michigan an instrument revoking or modifying such restrictions. . . .

Pertinent to this case, the restrictive covenants contained the following provision:

> 4. No part of said real estate or any building structure or improvement thereon shall be used for other than industrial, warehouse or commercial non-retail sales.

Beginning in 1995 and continuing through 2020, Cassopolis leased a significant portion of the industrial park to a local farmer for agricultural use, which included the hauling and spreading of manure. In 2006, Schwintek, which manufactures components for boating and recreational-vehicle industries, purchased a 3.28-acre parcel adjacent to the farmland in the industrial park. After constructing a manufacturing facility, Schwintek moved into the industrial park in March 2008.

In June 2020, Cassopolis sold 15.65 acres in the industrial complex to HTB based on HTB's assurance that it would build a 30,000-square-foot building, with an anticipated investment of three million dollars and the creation of 25 jobs. The village council authorized the sale of an additional 23.41 acres in the park to HTB in August 2020. HTB obtained all of the necessary licenses and permits to build its marijuana cultivation and processing facility.

In October 2020, the president of Schwintek told the owner of HTB that he was opposed to marijuana and threatened to file a lawsuit against HTB because he believed that HTB would be engaging in agricultural activity in violation of the restrictive covenants. Schwintek's president claimed that HTB's operations would inhibit Schwintek's business and decrease its property value.

HTB maintained that its business did not violate the restrictive covenants. But, in light of the threats of legal action, on October 23, 2020, HTB and the village of Cassopolis executed and recorded a Revocation and Release of Restrictive Covenants. The revocation states that it is "for the express purpose of terminating and forever releasing and discharging the 'Restrictive Covenants' " and that HTB intended to "revoke, terminate, extinguish and release the Restrictive Covenants through this instrument." "Restrictive Covenants" are defined within the revocation to include the entire restrictive covenant recorded "in Official Records Book 506, Page 361, Register of Deeds of Cass County, Michigan." The revocation further states that "the Restrictive Covenants

are hereby revoked, terminated, extinguished and released in their entirety; shall be of no further force or effect; and no longer burden or encumbrance on title to the Property."

In November 2020, HTB began construction on its building. Three months later, in February 2021,[1] Schwintek filed a complaint against HTB alleging that HTB's agricultural use breached the restrictive covenants. Schwintek acknowledged that the restrictive covenants had been revoked, but it asserted that the revocation was premature, non-uniform, materially changed the character of the industrial park, and was unlawful because HTB did not own 75% of the appraised value in the industrial park.[2] Schwintek also filed an ex parte motion for a temporary restraining order (TRO) to halt HTB's construction and a motion for preliminary injunction. The trial court issued the TRO on the same day.

HTB moved to dissolve the TRO. Following a two-day evidentiary hearing, the trial court determined that Schwintek was not likely to succeed on the merits of its claims because, as an owner of more than 75% of the land in the industrial park, HTB was authorized to revoke the restrictive covenants. The court also concluded that the revocation became effective on January 1, 2021. The court found that HTB's harm was actual, while Schwintek's harm was merely speculative. Based on its findings, the trial court dissolved the TRO and denied the motion for a preliminary injunction.

HTB moved to dismiss Schwintek's complaint pursuant to MCR 2.116(C)(7)[3] and MCR 2.116(C)(8). In light of the lengthy evidentiary hearing where the parties presented substantial evidence and testimony, the trial court considered the motion under MCR 2.116(C)(10). The trial court granted the motion and dismissed Schwintek's complaint in its entirety.

This appeal followed.

III. ANALYSIS

A. STANDARD OF REVIEW

The trial court granted summary disposition to HTB under MRC 2.116(C)(10). "We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion for summary disposition pursuant to MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Woodring v Phoenix Ins Co,* 325 Mich App 108, 113; 923 NW2d 607 (2018). Summary disposition under MCR

---

[1] By February 2021, HTB had constructed the steel frames and completed the plumbing and electrical work.

[2] Schwintek also brought claim against Cassopolis concerning a violation of the Open Meetings Act; however, it later abandoned this claim. Cassopolis is not a party to this appeal.

[3] This ground related to Schwintek's initial claim that Parcel A was purchased in violation of the Open Meetings Act, which was subject to a 60-day statute of limitations. But Schwintek subsequently amended its complaint omitting the Open Meetings Act claim.

2.116(C)(10) is only appropriate when there is no genuine issue of material fact. *El-Khalil*, 504 Mich at 160. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013).[4]

"The interpretation of restrictive covenants is a question of law that this Court reviews de novo." *Eager v Peasley,* 322 Mic App 174, 179; 911 NW2d 470 (2017).

## B. REVOCATION

Schwintek argues that the HTB failed to revoke the restrictive covenants because the revocation was untimely, nonuniform, and unreasonable.[5] We disagree.

"Restrictive covenants involve two fundamental freedoms—the freedom to contract and the freedom to use property." *Mazzola v Deeplands Development Company,* LLC, 329 Mich App 216, 223-224; 942 NW2d 107 (2019). "Restrictive covenants are construed strictly against those claiming the right to enforce them, and all doubts are resolved in favor of the free use of property."

---

[4] Within its standard of review discussion, Schwintek asserts that it was deprived of due process because the trial court improperly converted HTB's summary disposition motion under MCR 2.116(C)(7) and (C)(8) to one under (C)(10) without any discovery. First, Schwintek failed to raise this argument before the trial court. A due-process issue must be raised at the trial court level to be preserved. *Bay Co Prosecutor v Nugent*, 276 Mich App 183, 192-193; 740 NW2d 678 (2007) ("Plaintiff did not assert a due process claim below; therefore, this issue is unpreserved."). Moreover, Schwintek has not properly presented this issue in its statement of questions presented. MCR 7.215(C)(5); *Grand Rapids Employees Independent Union v Grand Rapids*, 235 Mich App 398, 409–410; 597 NW2d 284 (1999). Accordingly, we decline to reach this issue. See *Caldwell v Chapman*, 240 Mich App 124, 132; 610 NW2d 264 (2000).

In its reply brief, Schwintek states that it is simply pointing out that this Court's review should be under a (C)(8) standard, not a (C)(10) standard. We disagree. "A trial court is not necessarily constrained by the subrule under which a party moves for summary disposition." *Computer Network, Inc v AM Gen Corp*, 265 Mich App 309, 312; 696 NW2d 49 (2005). The trial court held an evidentiary hearing to address Schwintek's request for a preliminary injunction and HTB's motion to dissolve the TRO. The parties presented exhibits and several witnesses testified at the evidentiary hearing. The trial court recognized that, pursuant to MCR 3.310(A)(2), all of the evidence received at the evidentiary hearing was part of the trial record and would not need to be repeated at the trial, if there was one. The trial court considered the evidence from the evidentiary hearing and considered HTB's motion for summary disposition under MCR 2.116(C)(10). The trial court was not constrained by the subrules specified by HTB in its motion for summary disposition and, since it considered evidence outside of the pleadings, it could proceed under the appropriate subrule. *Computer Network,* 265 Mich App at 312. We also note that Schwintek's brief includes numerous quotations and citations to testimony presented at the evidentiary hearing.

[5] Schwintek has not argued that the trial court erred in finding that HTB owned 75% of the real estate in the industrial park.

*Id.* at 224 (quotation marks and citations omitted). Our Supreme Court summarized the general rules for construing restrictive covenants in *Thiel v Goyings,* 504 Mich 484, 496; 939 NW2d 152 (2019):

> Courts review restrictive covenants with a special focus on determining the restrictor's intent. "[W]e are not so much concerned with the rules of syntax or the strict letter of the words used as we are in arriving at the intention of the restrictor, if that can be gathered from the entire language of the instrument." *Tabern v Gates*, 231 Mich 581, 583; 204 NW 698 (1925). We determine the intended meaning of the chosen language by reading the covenants "as a whole rather than from isolated words" and must construe the language "with reference to the present and prospective use of property . . . ." *Donnelly v Spitza*, 246 Mich 284, 286; 224 NW 396 (1929); see also *Seeley v Phi Sigma Delta House Corp*, 245 Mich 252, 253; 222 NW 180 (1928) ("The language employed in stating the restriction is to be taken in its ordinary and generally understood or popular sense, and is not to be subjected to technical refinement, nor the words torn from their association and their separate meanings sought in a lexicon."). And we enforce unambiguous restrictions as written. *Bloomfield Estates Improvement Ass'n, Inc v Birmingham*, 479 Mich 206, 214; 737 NW2d 670 (2007). Thus, we consider challenges to restrictive covenants in a contextualized, case-by-case manner.

## 1. EFFECTIVE DATE

Schwintek argues that the trial court erred in holding that the revocation began on the next 10-year renewal date, which was January 1, 2021. We disagree.

The trial court's decision on this issue was based on this Court's decision in *Brown v Martin*, 288 Mich App 727; 794 NW2d 857 (2010). In *Brown*, this Court considered whether an amendment to a restrictive covenant in a subdivision deed took immediate effect upon recording of the amendment, or upon commencement of the next automatic renewal period. Ultimately, this Court concluded that, since "the amendment was by less than the unanimous vote of the then lot owners, the amendment [would] not take effect until the end of the current 10–year extension period." *Id*. at 733. Similar to the provision in this case that authorized modification or revocation of the restrictive covenants, the restrictive covenants in *Brown* provided:

> (A) Term: These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of twenty-five years from the date these covenants are recorded, after which time said covenants shall be automatically extended for successive periods of ten years unless an instrument signed by a majority of the then owners of the lots has been recorded, agreeing to change said covenants in whole or in part. [*Id*. at 729.]

Just a few months after the covenants automatically renewed on June 27, 2007, the defendants in *Brown* began operating a hair salon in their home. *Id*. The plaintiffs complained that the home-based business violated the neighborhood's restrictive covenants. *Id*. In response, in March 2008, a majority of the lot owners "passed an amendment of the covenant allowing for certain home-based businesses, including hair salons." *Id*. The plaintiffs sought declaratory and

injunctive relief to enforce the original restrictive covenants. *Id*. at 730. The defendants argued that the amendment was effective on the date that it was recorded. *Id.* The trial court granted summary disposition in favor of the defendants, concluding that amendment took immediate effect. *Id*.

This Court disagreed with the trial court and held that the amendment would not become effective until the end of the current 10-year extension period, which was June 28, 2017. *Id*. at 733. This Court explained that the plain language of the restrictive covenants limited amendments to "periods of ten years" if the amendment was by less than a unanimous vote. *Id*. at 732. Because the amendment was by a majority of the lot owners and was not unanimous, this Court held that the amendment did not take immediate effect. *Id.* at 733. This Court directed the trial court to enter an order enjoining the defendants from operating the hair salon in their home until the expiration of the 10-year extension period or a unanimous vote of the lot owners. *Id*. at 734.

In this case, the restrictions automatically renewed on January, 1, 2011. The next 10-year period was due to expire on December 31, 2020. The revocation was executed and recorded on October 23, 2020. Similar to the provision at issue in *Brown*, the plain language of the restrictive covenants provides for an automatic 10-year renewal "unless the owners of more than [75%] of the real estate . . . shall execute and record . . . an instrument revoking or modifying such restrictions." Because the revocation was executed and recorded during the renewal period, it became effective *after* the renewal period ended, which was on January 1, 2021.[6]

## 2. UNIFORMITY

Schwintek argues that the trial court erred in holding that the revocation applied to the entire industrial park. We disagree.

Schwintek maintains that the revocation only applies to HTB's property because portions of the revocation specifically state that the restrictive covenants no longer apply to "the property," which the revocation defines as the land owned by HTB. The legal descriptions of Parcels A and B were also attached to the revocation. However, the introductory paragraph of the revocation states that it is "for the express purpose of terminating and forever releasing and discharging the 'Restrictive Covenants' . . . ." Further, the revocation provides that HTB, as owner of more than 75% of the real estate in the industrial park, "desire[d] to revoke, terminate, extinguish and release the Restrictive Covenants through this instrument, and the Village consents to the same." "Restrictive Covenants" are defined within the revocation to include the *entire* restrictive covenant

---

[6] We are not persuaded by Schwintek's argument that the revocation was void because it was executed and recorded on October 23, 2020 and states that it is "[e]ffective as of the date hereof." In *Brown*, the defendants clearly intended the amendment to be effective upon the date of recording, were already operating their home-based business, and argued to the courts that the amendment was effective immediately; yet, this Court did not hold that the amendment was void. *Brown,* 288 Mich App at 729, 730. We decline to reach such a conclusion in this case as well.

recorded "in Official Records Book 506, Page 361, Register of Deeds of Cass County, Michigan." The revocation further states that "the Restrictive Covenants are hereby revoked, terminated, extinguished and released *in their entirety*; shall be of no further force or effect; and no longer a burden or encumbrance on title to the Property." (Emphasis added).

We agree with the trial court's determination that the plain language of the revocation leads to the conclusion that it revoked the entire restrictive covenant and applied uniformly to all of the lots in the industrial park.[7] "In construing restrictive covenants, the overriding goal is to ascertain the intent of the parties. Where the restrictions are unambiguous, they must be enforced as written." *Eager*, 322 Mich App at 180 (quotation marks and citation omitted).

## 3. REASONABLENESS

Schwintek further argues that the revocation was substantively unreasonable in light of the original intent of restrictive covenant to maintain an industrial park. We disagree.

Our appellate courts have not adopted the "substantively reasonable" requirement that Schwintek relies on from caselaw in other jurisdictions. See, e.g., *Armstrong v Ledges Homeowners Ass'n, Inc*, 360 NC 547, 560-561; 633 SE2d 78 (2006) (holding that a homeowners' association's amendment to a restrictive covenant was invalid and unenforceable where it provided for mandatory membership in the association and unreasonably authorized the association unlimited power to broadly assess and collect fees from the association's members);[8] *Nettles v Ticonderoga Owners' Ass'n, Inc*, 306 P3d 441, 445 (NM, 2013) (holding that there was a question of fact as to the reasonableness of a homeowners' association's amendments to the definition of "common easements" in a covenant, which had the effect of requiring some landowners to maintain a road at their own expense while still having to pay common assessments to the association's maintenance fund); *Holiday Pines Prop Owners Ass'n, Inc v Wetherington*, 596 So 2d 84, 87 (Fla Dist Ct App, 1992) (holding that it was unreasonable for a developer to amend a

---

[7] Schwintek relies on this Court's decision in *Maatta v Dead River Campers, Inc.*, 263 Mich App 604; 689 NW2d 491 (2004) to support its arguments. However, it was undisputed in *Maatta* that the revocation of one provision of the restrictive covenants was specifically intended to apply to only one of the 375 lots in the subdivision, while the other 374 lots remained subject to all of the restrictive covenants. Conversely, in this case, the revocation was specifically intended to apply uniformly to all of the property in the industrial park.

[8] The *Armstrong* court explained why the amendment was unreasonable:

> [P]etitioners purchased their lots without notice that they would be subjected to additional restrictions on use of the lots and responsible for additional affirmative monetary obligations imposed by a homeowners' association. This Court will not permit the Association to use the Declaration's amendment provision as a vehicle for imposing a new and different set of covenants, thereby substituting a new obligation for the original bargain of the covenanting parties. [*Id.* at 561.]

restrictive covenant to require mandatory membership in a homeowners' association that was granted broad powers of enforcement, maintenance, and rule enactment because the amendment "significantly restricted the lot owner's use of his or her property.").

Our appellate courts have, at times, relied on caselaw from other jurisdictions when appropriate. See *Brown,* 288 Mich App at 732. However, all of the out-of-state cases cited by Schwintek in support of its argument pertain to *amendments* to restrictive covenants and none of the cases involve *revocations*. And we find each of the cases factually distinguishable. The revocation in this case was executed by the requisite 75% super-majority and it did not subject the property in the industrial park to additional encumbrances. We respectfully decline to adopt a new standard to review an unambiguous contract in Michigan.[9]

Viewing the evidence in the light most favorable to Schwintek, the trial court did not err by concluding that there was no genuine issue of material fact as to whether the revocation of the restrictive covenants was valid. Because the restrictive covenants were successfully revoked effective January 1, 2021, it is unnecessary for this Court to address whether HTB's proposed facility violates the covenants.

Affirmed. As the prevailing party, appellee may tax costs.

/s/ David H. Sawyer
/s/ Anica Letica
/s/ Sima G. Patel

---

[9] We further note that there is no clear "reasonableness" standard among the other jurisdictions that apply such a test. And some jurisdictions do not even employ a "reasonableness" test.